749 F.2d 437
 16 Fed. R. Evid. Serv. 1296
 Maria KELSAY, individually and as Personal Representative of
the Estate of Bruce Kelsay, Plaintiff-Appellant,
v.
CONSOLIDATED RAIL CORPORATION and National Railroad
Passenger Corporation, Defendants-Appellees.
 No. 83-2977.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 17, 1984.
Decided Nov. 21, 1984.
 
 Charles A. Asher, South Bend, Ind., for plaintiff-appellant.
 Edward L. Murphy, Jr., Livingston, Dildine, Haynie & Yoder, Fort Wayne, Ind., for defendants-appellees.
 Before PELL, BAUER and POSNER, Circuit Judges.
 PELL, Circuit Judge.
 
 
 1
 Plaintiff, Maria Kelsay, the widow and personal representative of Bruce Kelsay, appeals from a judgment entered after a jury verdict in favor of defendants, Conrail and Amtrak. The plaintiff does not challenge the sufficiency of the evidence to support the verdict, but relies on asserted trial errors, advancing six instances of claimed reversible error by the district court, three with respect to evidentiary rulings and three with respect to instructions that were either given or refused. Of the questions presented, we find only three issues to be of sufficient significance to require extended discussion. First, plaintiff claims that the district court abused its discretion when it excluded both eyewitness and expert testimony, as well as police reports, concerning two prior accidents at the same railroad crossing where Bruce Kelsay died. Second, plaintiff claims that the district court committed reversible error when it allowed various witnesses to testify as to their understanding of the significance of a white line painted on the road near a grade railroad crossing, particularly in light of the court's refusal to give limiting instructions concerning that testimony. Finally, plaintiff asserts error in the instruction relating to the duty of a driver approaching a railroad crossing when his view is obstructed.
 
 I. THE FACTS
 
 2
 The lawsuit filed by plaintiff arose out of an accident causing the death of her husband. The facts surrounding the accident are essentially undisputed. On September 8, 1981, Kelsay, then employed by G.T.E. Corporation, left his employer's premises in Wabash, Indiana, followed by another G.T.E. employee, James Clark. Both men drove Ford vans, which have a wide door post on their right side directly behind the passenger's seat. This door post partially restricts the vision of a driver who looks slightly back and to the right. Clark testified that a driver of the type of vehicle Kelsay was driving would also have a problem because of the noise created by the more than 100 tool and equipment items in the truck. The two men left the company office at 7:15 a.m., headed to a work assignment north of Atwood, Indiana, a town about forty miles from Wabash. The morning was clear and sunny, and the pavement was dry at all relevant places.
 
 
 3
 Upon arriving in Atwood, Kelsay and Clark, for some reason not apparent in the record, chose to continue northwardly on Prairie Street, although both Harrison and Prairie Streets crossed the railroad tracks. The Harrison Street crossing, one block east of Prairie, had both automatic flashers and gates. The intersection with two parallel tracks on Prairie Street does not form a ninety degree angle; rather, the track runs from the east-southeast to the west-northwest forming a seventy-degree angle with northbound Prairie Street. Thus, instead of merely looking directly to the right to see if a train was approaching from that direction, a motorist would have to look slightly behind himself as he looked to the right. The street rises five feet over the final fifty feet immediately south of the railroad tracks. There are no active safety mechanisms at the Prairie Street crossing. The crossing, however, was protected by the statutorily required round railroad disc warning signs with crossbucks nearer the crossing. There was also a white line across the pavement thirty-one feet south of the crossing.
 
 
 4
 Amtrak owned and employees of Conrail operated the train involved in the accident that resulted in Kelsay's death. The train left Fort Wayne, Indiana, at about 7:30 a.m., approximately one and one-half hours behind schedule. As it approached Atwood from the east just more than an hour later, the train was going fifty-eight miles per hour. The train's engineer and fireman testified that Kelsay never slowed down over the last fifty feet as the road rose to the level of the crossing. On direct examination, Clark testified that after turning onto Prairie, Kelsay had gained speed to approximately fifteen miles per hour, that Kelsay put his brakes on "before going up to the approach" and then the brakes came off and he was not going over ten miles per hour as he was actually on the crossing. On cross-examination, however, Clark testified that Kelsay's speed remained "steady" from the intersection up to the crossing. The cessation of the braking occurred, according to Clark, as the front wheel of the Kelsay truck reached the first rail. The train was occupying the other, or northernmost set of tracks, and, of course, that is where the accident took place.
 
 
 5
 The engineer testified he had been giving the statutorily required warnings as the train approached the crossing but interrupted the normal whistle pattern in order to give an emergency short series of sharp blasts upon the whistle in order to get Kelsay's attention. Upon realization that Kelsay might not stop, the engineer gave a full emergency application of the brakes, even though this under the circumstances was a futility; Kelsay had already started to cross the tracks to the south of the one on which the train was operating. The locomotive hit the van, apparently killing Kelsay instantly and then dragging the van west-northwest before finally stopping. There were no skid marks on the pavement to indicate that Kelsay ever applied his own brakes, nor was there any other evidence that he took any evasive action. Also at all pertinent times the locomotive's two strobe headlights were functioning in an on position. The engineer was able to see Kelsay's face for a short distance and Kelsay was never seen to move his head, but "just kept looking right straight ahead."
 
 
 6
 In addition to evidence on the angle of the intersection and the effect of the early morning sun on a driver's ability to discern a train approaching from the east-southeast, the plaintiff tried to establish the ultrahazardousness of the crossing through evidence of visual obstructions to a view of the railroad tracks. The southeast quadrant formed by the intersection did contain foliage, although none of this was on the defendants' right of way, and the extent of the visual impediment presented by this foliage was vigorously disputed. Plaintiff introduced evidence that the first totally unobstructed view of a sufficient distance to reveal an oncoming sixty miles-per-hour train did not occur until thirty-one feet south of the crossing. Defendant introduced evidence that Kelsay should have been able to see at least some portion of the train at all times during his approach to the crossing. There were various estimates of the speed at which Kelsay approached the crossing and also evidence of how much distance that it would take a driver to perceive the train and then stop his vehicle at each of those speeds. Some of these distances were substantially greater than the distance that plaintiff asserted provided the first unobstructed view of the tracks, and, of course, some were less.
 
 II. THE TRIAL
 
 7
 Plaintiff alleged two forms of negligence on the part of defendants--one in the operation of the train that struck Kelsay's van and one in the failure of defendants to install safety devices adequate to meet the needs of the allegedly ultrahazardous crossing. To prevail on the second prong, it would have been necessary for plaintiff not only to introduce evidence showing the crossing was ultrahazardous but that the defendants had knowledge of that status. To return a verdict for defendants, the jury must have found that the train sounded its whistle in accordance with statutory requirements. Apparently because the evidence was disputed, plaintiff has not alleged error in the jury's failure to find defendants liable due to the operation of this particular train. The second form of alleged negligence, however, is involved in the claim of trial error. Plaintiff attempted to establish that the crossing was ultrahazardous, that the defendants knew or should have known of the ultrahazardous condition of the crossing, and that defendants were negligent in failing to mitigate the ultrahazardousness by installing active warning devices at the crossing.
 
 
 8
 As previously delineated, plaintiff introduced evidence of a number of factors to show that the crossing was ultrahazardous: the angle of the crossing; the degree of the grade; the position of the sun in the early morning; and, the various visual obstructions. The defendants introduced no testimony to counter plaintiff's evidence that the configuration of the crossing had remained unchanged since 1950. Although Clark testified that in his opinion the sun created a visibility problem for Kelsay, two other witnesses called by the plaintiff, one a reconstruction expert and the other, the safety director of Kelsay's employer, testified respectively that the sun was going to be no problem for Kelsay and that the sun was not shining directly in Kelsay's eyes.
 
 
 9
 In an effort to establish the second predicate to negligence liability under a theory of ultrahazardousness, plaintiff twice attempted to introduce evidence that defendants knew or should have known that the crossing was ultrahazardous. Both attempts to establish notice centered around the fact that there had been two prior fatal accidents at the Prairie Street crossing--one on October 20, 1951, and the other on July 2, 1968. The plaintiff contended the prior accidents were similar to the one in suit. Based upon Rule 403 of the Federal Rules of Evidence, however, defendants objected to the introduction of this evidence. The district court ruled that plaintiff could not introduce evidence of the prior accidents because such evidence would lead to issue confusion, unfair prejudice to defendants, and a misled jury.
 
 
 10
 Plaintiff made two offers of proof of the evidence that she would have presented concerning the prior accidents. Plaintiff's first offer of proof consisted of testimony by the county sheriff, who had been on the scene at all three accidents, in 1951 as a curious adolescent, and in both 1968 and 1981 in his official capacity. The sheriff testified that all three accidents shared a number of common elements: they occurred early in the morning; the weather was clear; all three vehicles were going north on Prairie Street; all three trains were going west-northwest; and finally, in all three, the point of impact was the right front area of the vehicle and the left front area of the locomotive. The sheriff also testified about several dissimilarities between the accidents: the 1951 accident involved a nineteen year old driver whose windows had been soaped by Halloween pranksters; and, the 1968 accident involved a seventy-one year old man whose vehicle reached the crossing a fraction of a second after the train, while the 1951 and 1981 accidents involved vehicles that arrived at the crossing a split second before the arrival of the train. Also, an exhibit reflected that the 1951 train was traveling at seventy miles per hour and the 1968 train at seventy-nine miles per hour.
 
 
 11
 The second offer of proof consisted of the testimony that plaintiff's accident reconstructionist would have given had plaintiff been allowed to introduce the official accident reports of the two prior accidents. The expert would have testified that he had never previously investigated accidents in which the details were so substantially similar. Additionally, plaintiff separately attempted to introduce the two accident reports into evidence.
 
 
 12
 The other significant evidentiary issue raised by plaintiff concerns testimony from two witnesses concerning the white line on Prairie Street thirty-one feet south of the crossing. On cross-examination, defendants asked the county sheriff about the white line. The court rejected plaintiff's objection that the legal significance of the white line was "a matter of law which is for the court to instruct." The sheriff responded to defendants' question by stating that the line "is a place for vehicles to stop," and, if a driver stopped there, he would have an unobstructed view down the track. Later in the trial, and again over plaintiff's objection, the court allowed defendants to cross-examine the G.T.E. investigator about the white line. Defendants asked the witness, as a driver in Indiana, what the presence of the white line means. The witness responded: "The state law means to slow down." Defendants then impeached the witness based upon his deposition testimony that the line means "to stop and look." He explained the discrepancy by stating that, as a safety man, he would stop and look although the law might only require him to slow down. The judge then stated that he would instruct the jury what the law is at the end of the case.
 
 
 13
 Plaintiff submitted two instructions concerning the white line. One stated that the presence of a white line presents no duty to stop beyond the duty imposed by statute, Ind. Code Sec. 9-4-1-106. The second instruction stated that the jury should ignore the personal opinions of the witnesses as to the significance of the white line. The trial judge rejected the two proposed instructions, noting that he had already decided to recite to the jury the entire text of section 9-4-1-106, which states:
 
 
 14
 Whenever any person driving a vehicle approaches a railroad grade crossing, the driver of such vehicle shall stop within fifty feet [50' ] but not less than ten feet [10' ] from the nearest track of such railroad and shall not proceed until he can do so safely, when:
 
 
 15
 (a) A clearly visible electric or mechanical signal device gives warning of the immediate approach of a train.
 
 
 16
 (b) A crossing gate is lowered or when a human flagman gives or continues to give a signal of the approach or passage of a train.
 
 
 17
 (c) A railroad train ... approaching within one thousand five hundred feet [1,500' ] of a highway crossing emits a signal audible for such distance and such train, by reason of its speed or nearness to such crossing, is an immediate hazard.
 
 
 18
 (d) An approaching train is plainly visible and is in hazardous proximity to such crossing.
 
 
 19
 Plaintiff objected that there was no mention of any white line in the statute and that the effect of a failure to instruct concerning its significance would leave the jury with the impression that Kelsay had breached his statutory duty to stop at the white line. Plaintiff then preserved the issue for appeal by objecting to the court's refusal to instruct.
 
 
 20
 Finally, plaintiff charges error in the trial court's Instruction 45, which stated:
 
 
 21
 The law requires a driver of a motor vehicle approaching a railroad crossing whose view is obstructed, to drive at such a speed that the vehicle could be stopped, by the exercise of ordinary care, once the driver sees or hears an approaching train which is so close as to constitute an imminent danger.
 
 
 22
 Plaintiff asserted that the instruction invaded the province of the jury by telling them that reasonable and ordinary care, generally defined in a separate instruction, required Kelsay to maintain a certain speed, whereas the question of what speed to maintain should have been solely for the jury to determine. Furthermore, plaintiff contended that the instruction effectively charged Kelsay with an absolute duty to know the extent to which the obstructions restricted his view so that he could maintain a low enough speed to be able to stop once he perceived the train. Plaintiff properly preserved these objections to the instruction and raises the same contentions on appeal.
 
 III. PRIOR ACCIDENTS
 
 23
 Plaintiff claims that the trial court erred in excluding all evidence of the two prior accidents at the Prairie Street crossing. Defendants correctly note that rulings on the admissibility of evidence are within the sound discretion of the trial court and must stand unless we determine that the court abused its discretion. See, e.g., Gardner v. Southern Railway Systems, 675 F.2d 949, 952 (7th Cir.1982) (per curiam). The ground upon which the trial court excluded the evidence of prior accidents is Rule 403 of the Federal Rules of Evidence. Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The district court excluded the evidence because he thought it was confusing, misleading, and potentially unfairly prejudicial to defendants. Although the district court relied only upon the first portion of the rule, we cannot ignore completely that when a claim is made for the showing of prior accidents, an element of a trial on collateral issues, sometimes termed a trial within a trial, is introduced with the real possibility of undue delay. Here, the defendants which were not operating either of the earlier trains, if they had to defend fully as to the facts of the earlier accidents would have had to have attempted at least to bring in much more evidence regarding those accidents, one of which had occurred three decades previously.
 
 
 24
 Defendants do not contend that the evidence was irrelevant. Rather, they maintain that the other accidents were sufficiently remote in time as to diminish the relevancy of the accidents, plus the several dissimilarities between the present and earlier occurrences, thus tipping the balance against admissibility in light of the confusion and unfair prejudice that would occur if the court admitted the evidence. Trial courts must exercise caution when they exclude relevant evidence upon the basis of a "danger of unfair prejudice." "Of course, 'unfair prejudice' as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party. Virtually all evidence is prejudicial or it isn't material. The prejudice must be 'unfair.' " Dollar v. Long Manufacturing, N.C., Inc., 561 F.2d 613, 618 (5th Cir.1977), cert. denied, 435 U.S. 996, 98 S.Ct. 1648, 56 L.Ed.2d 85 (1978).
 
 
 25
 This court recently in another case involving an Indiana crossing accident, Gardner v. Southern Railway Systems, 675 F.2d 949 (7th Cir.1982) (per curiam), faced an issue virtually identical to the one presented here. As in the present case, the trial court in Gardner excluded evidence of a prior accident. The accident there occurred in 1978, while the prior accident occurred some 15 months earlier. We noted that plaintiff had attempted to introduce evidence of the prior accident to impute notice to the railroad that the crossing presented a dangerous condition, 675 F.2d at 950, which is essentially the same reason that plaintiff in the present case had for seeking the admission of the evidence. We also noted that the physical conditions and surrounding circumstances of the two accidents were quite similar. Id. at 951. Nonetheless, we found that the district court had not abused its discretion when it excluded the evidence.
 
 
 26
 We identified four factors leading to our conclusion that the trial court did not abuse its discretion. First, we noted that the conditions and circumstances were different in some respects. Second, the fact that there was no evidence that the representatives of the deceased driver in the prior accident had ever filed a claim or a lawsuit suggested that the driver's own negligence had caused the first accident. Our third concern was that, "notwithstanding the ambiguity surrounding the prior accident, the jury might infer from evidence of the prior accident alone that ultra-hazardous conditions existed at the site and were the cause of the later accident without those issues ever having been proved." Finally, we noted that plaintiff had been able to introduce evidence in a non-prejudicial manner that the same conditions had existed at the crossing for a number of years. Id. at 952. In light of all these factors, we determined that the trial court had not abused its discretion in excluding the evidence because the danger of unfair prejudice substantially outweighed its probative value. Id. at 952-53.
 
 
 27
 All these factors are present in the instant case as well. First, the circumstances of the prior accidents, although similar, included significantly different facts. For example, the 1951 accident involved a nineteen year old driver whose windows, heavily soaped by Halloween pranksters, could not have permitted an adequate view of the crossing and who was hit by a train traveling approximately ten miles per hour faster than the Kelsay train. Similarly, the 1968 accident involved a seventy-one year old driver who arrived at the crossing slightly after a seventy-nine mile per hour train did. Finally, the visual obstructions from the surrounding foliage may have changed substantially over a thirty year period.
 
 
 28
 Second, there was no evidence that the survivors of either of the two prior accident victims ever filed a claim or lawsuit due to the accidents. While certainly not conclusive, the lack of any such evidence may suggest that the accidents were the fault of the drivers.
 
 
 29
 Third, the danger that the jury might infer from the mere existence of the two prior accidents that the crossing was ultrahazardous is even greater in this case than in Gardner due to the remoteness in time of the two accidents. The substantial remoteness in time of the other accidents would further increase the danger of unfair prejudice to defendants because of the difficulty of having to marshal evidence in three cases to establish an adequate defense to this case.
 
 
 30
 In any event, as in Gardner, through the testimony of the county sheriff that the conditions at the crossing had remained substantially the same since 1950 and the testimony of numerous witnesses concerning the various characteristics of the crossing that might indicate its dangerousness, plaintiff was able to introduce, in a non-prejudicial manner, the alleged dangerous condition of the crossing.
 
 
 31
 Finally, we note that the wide door post on the right side of the truck would have partially restricted the vision of the driver who looked slightly back and to the right. This obstruction would have been apparent to the decedent from the time he left his employer's premises, even if he had never driven this vehicle before that day. As he approached the tracks the seventy-degree angle of the tracks would have been visible to a driver reasonably attentive to his own safety. Looking from the vehicle down the tracks to the southeast would have meant looking approximately in the direction of the view-obstructing truck post. In considering whether this was an ultrahazardous crossing, the railroad should not be chargeable with the condition of a vehicle over which it had no control. Indeed, the court instructed the jury to this effect.
 
 
 32
 Perhaps, in this case, we needed to have done no more than to recite the facts, cite Gardner, and go on to other issues. But the argument can be, and usually is, made that the evidence of other occurrences, if relevant, should go in evidence and be given the weight to which, upon evaluation by the factfinders, it would be entitled. The matter is not that simple, however, and because of the inherent danger of prejudice, we properly, upon review, accord the decision of the trial judge the deference of broad discretion, and do not lightly disagree with the ruling. The judge had heard all of the evidence and is in a much better position than we to evaluate the interplay of the Rule 403 factors. He or she knows what other evidence was properly in which could bear on the hazardous nature of the crossing and the knowledge thereof by the railroad company.
 
 
 33
 That two other fatal accidents happened at about the same time of the morning could persuade some jurors that the crossing was a veritable deathtrap and that the presently operating railroad company should reasonably have been aware of a real likelihood of further accidents. Of course, any railroad crossing, no matter how it is protected by signals, is ultrahazardous if a moving vehicle attempts to move over it simultaneously with an oncoming train. While we have assumed arguendo that both accidents were relevant, we really cannot regard the one thirty years earlier as having any independent relevance. Aside from its remoteness, there would be no very practical way of knowing what the conditions of foliage were then. Also any real relevance would tend to be dissipated by the fact that a youthful driver was involved, perhaps an impetuous one, who attempted a crossing with vision obscured by Halloween-soaped vehicle windows.
 
 
 34
 Turning to the second accident, it is true that it occurred closer in time to the one at issue here, nevertheless it was more than a dozen years earlier. Even over that period of time there could have been substantial changes in the obscuring effect of nearby foliage. The age of the driver in the second accident would have become an issue if the judge had thrown open the gates for consideration of this accident. Certainly we would not suggest that a seventy-one year old person is over the hill. Nevertheless, the existence of slower reactions, or acuity of vision, indeed senility, is not measured by the number of years one has acquired. Also the speed of the train in the 1968 accident was approximately twenty-one miles per hour faster than that of the Kelsay train.
 
 
 35
 It is true, some of the differences between the 1968 and 1981 accidents are of little consequence. Thus, that the 1968 driver apparently didn't beat the train to the intersection might seem to constitute a minimal differentiation. Indeed the driver had a second or so--and that would be all considering the number of feet per second the train was moving--longer to look for a train on the tracks. It is important though to know whether other apparent dissimilarities were of significance and that could only have been determined by a time-consuming collateral expedition into what all of the facts bearing on the other accident were, and whether those were of the calibre to say to the railroad you are operating over an ultrahazardous crossing.
 
 
 36
 Finally, we note that if this crossing were as dangerous to motorists as plaintiff would have us believe, it might be considered somewhat remarkable that only three accidents had occurred over a thirty-year period at this crossing which was occupied by fast-moving passenger trains. Indeed, upon examination of the testimony of William Billings, plaintiff's reconstructionist witness, the paucity of accidents over the thirty-year period is all the more remarkable, appearing to us to reflect rather clearly that the surrounding conditions of the crossing were not such, in and of themselves, to make it an ultrahazardous crossing. The witness testified that there were twenty-three trains daily going over the crossing and an average daily count for traffic of 250 cars. These figures apparently were as of the time of the accident. We do not know, of course, what the conditions of use were in 1952 and 1968 although it is common knowledge that rail traffic generally diminished in quantity in this country beginning at a time shortly after World War II. It is of interest to note that in the Village of Atwood, apparently not of sufficient size to be carried in the Rand McNally Atlas under "Cities and Towns," that there was this much vehicular traffic although there was a main crossing protected by automatic warning signals and gate only one block away. The inference is suggested that those in the area did not regard the crossing as dangerous. Nevertheless, Billings testified that on the amount of movement at the crossing the exposure factor was such that, in his opinion, cross-bucks were not an adequate protection.
 
 
 37
 No reasonable driver of an automobile would pull out on an arterial two-way highway without looking in both directions. Even though some do and cause serious accidents, caution is inherent because of the frequency of fast-moving vehicles on the main highway. The use of the railroad crossing is only occasional, however, and the caution observed on approaching a heavily travelled highway simply is not always exercised. This failure is unfortunately in the nature of Russian roulette.
 
 
 38
 In this case, we hold the trial judge properly exercised his discretion with regard to his evidentiary rulings on the prior remote-in-time dissimilar accidents.
 
 
 39
 IV. THE WHITE LINE--TESTIMONY AND INSTRUCTIONS
 
 
 40
 Plaintiff asserts reversible error arising out of the testimony of two witnesses concerning the white line painted on Prairie Street thirty-one feet south of the crossing and the later refusal of the trial court to give a specific instruction about the white line. The importance of this ruling arises out of the defendants' efforts to establish that Kelsay was contributorily negligent. Evidence of a failure to abide by regulations that require motorists to stop could lead the jury to conclude that Kelsay was contributorily negligent, especially in light of the court's instructions that violation of a safety regulation or statute is presumptively an act of negligence.
 
 
 41
 The thrust of the plaintiff's argument appears to be that two witnesses of the plaintiff, one the county sheriff and the other G.T.E.'s accident investigator, were permitted to give an opinion as to the legal significance of the white line, that neither was qualified as an expert on the subject, that, in any event, it was within the province of the court to tell the jury what the law was, and, finally, that the error of admitting these lay opinions was compounded by the court's failure either to give instructions or to give plaintiff's tendered instructions on the subject. Initially, our question is whether the witnesses were testifying as to a legal opinion, i.e., that they were saying in effect that the white line was a place at which motorists were required by law to stop or that the jury could have so understood their statements as being opinions to this effect.
 
 
 42
 On cross-examination of the sheriff the following occurred:
 
 
 43
 Q. On [exhibit] 21 do you see a white line?
 
 
 44
 A. Yes, sir, I do.
 
 
 45
 Q. Was the white line there on the date of the accident?
 
 
 46
 A. That is correct.
 
 
 47
 Q. What does that line signify?
 
 
 48
 MR. ASHER: Excuse me, Judge. If I can make the objection here, I think counsel is getting the witness to testify as to a matter of law which is for the Court to instruct.
 
 
 49
 THE COURT: I think he can testify. It may not be binding on either the Court or the Jury what he understands the purpose of that line is and where it is. If it is a question of law, it is certainly not binding on the Jury. I think it is a possible grey area. I will permit him to testify, and I will instruct on it later.
 
 
 50
 THE WITNESS: The white line in my opinion, sir, is a place for vehicles to stop.
 
 
 51
 By putting the witness's answer in the context that it immediately followed the judge's statement that as a matter of law what the witness would say was not binding on the jury, it appears that he is simply expressing his own personal opinion merely that the line was a place where vehicles could stop in safety short of the tracks.
 
 
 52
 The only place that either witness got into an expression of law was in the testimony of the safety manager of G.T.E. This colloquy in pertinent part reads as follows:
 
 
 53
 Q. Now do you operate a motor vehicle in the State of Indiana?
 
 
 54
 A. Yes, I do.
 
 
 55
 Q. What does the presence of a white line at a railroad crossing mean to you?
 
 
 56
 * * *
 
 
 57
 * * *
 
 
 58
 THE COURT: The State law means slow down.[1]BY MR. MURPHY: (Continuing)
 
 
 59
 Q. I don't want to take issue with you,--
 
 
 60
 THE COURT: Well, you asked him, and you are stuck with it. I am going to instruct the Jury about the law. You are not going to tell the Jury what the law is now. You asked the question. You are stuck with his answer on cross examination.
 
 
 61
 I will still instruct on it. Don't be quibbling with him about the law.
 
 
 62
 Get on.
 
 
 63
 MR. MURPHY: I am not quibbling with him, but he told me something different in his deposition.
 
 
 64
 THE COURT: Okay. You can impeach him, then.
 
 
 65
 MR. MURPHY: That is what I was going to do.
 
 BY MR. MURPHY: (Continuing)
 
 66
 Q. When I took your deposition, Mr. Loney, didn't you tell me to you that white line meant stop and look for trains on the track?
 
 
 67
 A. I told you as a safety man that is what I would do.
 
 
 68
 Q. Well, let's look on page 27, line 4.
 
 
 69
 THE COURT: Hold tight.
 
 BY MR. MURPHY: (Continuing)
 
 70
 Q. You see on line 1 where I start the question:
 
 
 71
 A. Yes, uh-huh.
 
 
 72
 Q. Question: "Did that white line have any meaning to you?["]
 
 
 73
 Then we go through a little colloquy.
 
 
 74
 "Do you mean what does the white line mean?"
 
 
 75
 And I said, "Yes."
 
 
 76
 And you said, "The white line means to me to stop and look."
 
 
 77
 Wasn't that your answer?
 
 
 78
 A. That means to me as a safety man that is what I would do at that type of crossing.
 
 
 79
 The only direct testimony by this witness on a matter of law was that the white line as a matter of law meant that a driver should slow down. It is true that in his earlier deposition the witness had said that the white line meant to stop and look for trains on the track. The answer to the deposition was brought in for the purposes of impeaching his trial testimony but he did not retreat from his trial testimony that the white line meant to slow down and, as far as stopping was concerned, that is only what he would have done as a safety man.
 
 
 80
 We have little doubt that the jury understood that these two witnesses were merely expressing their own personal opinions, neither claiming to be an expert on the law, on what should be done when seeing a white line across a roadway, particularly when beyond the white line there was an intersection, whether railroad or highway. We think there is little reason to doubt that this is nothing more than a common understanding of most drivers on the highway.
 
 
 81
 Indeed, the plaintiff apparently regarded the so-called legal opinions as merely personal opinions as indicated by one of the instructions tendered by the plaintiff but not given by the Court.
 
 
 82
 Some witnesses have offered statements as to their personal opinions as to the significance of some white paint referred to by some witnesses as a white line south of the subject crossing. I now instruct you that all of those comments are irrelevant and are stricken from the record. You should disregard all such answers and opinions entirely. (Emphasis added.)
 
 
 83
 Assuming, however, arguendo, that the testimony was properly characterized as opinions on the law by lay witnesses, it is necessary to look at the context in which the testimony occurred. The initial step is, of course, viewing the matter in the focus of whether the trial judge abused his discretion, recognizing the deference that is generally accorded to a trial judge's rulings on admissions or exclusions of evidence. This court has held that the decision of whether to admit certain testimony under Rule 701 of the Federal Rules of Evidence is committed to the sound discretion of the district court and a ruling will not be reversed absent a finding that the trial court abused its discretion. United States v. Jackson, 688 F.2d 1121, 1123 (7th Cir.1982).
 
 
 84
 The two witnesses, each of whom had investigated the accident, were called as plaintiff's witnesses and not as adverse witnesses. It was during the course of their cross-examination that the white line entered the picture. They had testified on what they did in their investigation. An inquiry as to conditions of the crossing was pursued, including reference to the pictures taken at the scene. Asking about the significance of the white line would seem to have been well within the scope of cross-examination.
 
 Rule 701, referred to above, states:
 
 85
 If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.
 
 
 86
 Without parsing the rule in detail, and setting aside the fact that the personal opinion of the witnesses may well have been helpful to a clear understanding of their testimony, we will assume, arguendo, that the court erred in admitting the testimony. We therefore must determine whether on that hypothesis the error requires reversal. In our opinion the jury was not misled and reversal is not required. It might have been better if the trial judge had, as he indicated he would do twice, given a specific instruction on the white line. There is no indication in the record nor have we found any specific Indiana statute dealing with the duty to stop at a white line. The court did not instruct specifically on the white line but instead gave a general instruction relating to the duty to stop when approaching a railroad crossing which was in the exact wording of the Indiana statute. This instruction has been set out in full earlier in this opinion. It is specific concerning the manner in which a person should drive when approaching a railroad grade crossing, and the clear implication from the specificity is that a white line is not a part of that manner. The effect of this instruction would have been to negative, particularly in view of the judge's earlier admonitions that he would instruct on the law, any legal significance in the challenged testimony. The clear implication of this is that a white line does not, per se, create a statutory duty to stop.
 
 
 87
 Viewing the record as a whole, and considering the ambiguity of the particular testimony which encompassed only a few lines in a transcript of a five-day trial, we conclude that the error, if any, was harmless.
 
 
 88
 Plaintiff's third asserted evidentiary ground for reversal is clearly lacking in merit. Plaintiff claims that the district court erred when it allowed a police officer, who had investigated the accident scene as well as approximately twenty previous railroad crossing accidents, to testify that in his opinion the cause of the accident was driver inattention. The court found that the officer's prior investigations qualified him as an expert. Plaintiff objected on two grounds: first, that his background did not warrant a finding that he was an expert; and, even if he were an expert, that he had not made sufficient observations at the scene to establish a proper foundation for his opinion.
 
 
 89
 Rule 702 of the Federal Rules of Evidence disposes of the claim that the officer failed to qualify as an expert witness by defining such a witness as one who has attained his expertise by, among other things, skill and experience. Despite his lack of formal training, the officer had extensive experience. Under the abuse-of-discretion standard that we must apply to the trial court's ruling, Smith v. Uniroyal, Inc., 420 F.2d 438, 440 (7th Cir.1970), we find no reversible error in the decision that the officer was qualified as an expert. The second issue, whether there was a sufficient foundation upon which the expert could reach a conclusion in this case, is also a matter committed to the discretion of the trial court. Spray-Rite Service Corp. v. Monsanto Co., 684 F.2d 1226, 1241 (7th Cir.1982), aff'd, --- U.S. ----, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). Although the officer did not take any exact measurements at the site, he was there for a lengthy period of time and made extensive, albeit sometimes inexact, observations. Consequently, the witness had a reasonable factual basis for his conclusions and was available for cross-examination, as well as argument by plaintiff, as to the weight to be accorded his testimony. American National Bank & Trust Co. v. K-Mart Corp., 717 F.2d 394, 399 (7th Cir.1983). We find no abuse of discretion in the district court's ruling that these observations provided a sufficient foundation for expert testimony as to the cause of the accident.
 
 
 90
 Indeed, on the basis of all of the other testimony concerning the accident which was before the members of the jury, presumably none of whom were experts, it is understandable that they would have concluded, as they apparently did, that the accident would not have happened if Kelsay, the driver, had been attentive.
 
 V. INSTRUCTION 45
 
 91
 The last ground of appeal meriting some consideration relates to plaintiff's objection to Instruction 45, given by the trial court and quoted in full earlier in this opinion. The other two instruction-related grounds raised by plaintiff concern the trial court's refusal to give two of plaintiff's requested instructions. Plaintiff's contentions with respect to those instructions are without merit. Instruction 45 presents a somewhat closer question. Plaintiff claims that the instruction required Kelsay to know in advance the extent of the visual obstructions at the crossing and to maintain a speed so that he would be able to stop once he perceived an approaching train that constituted an imminent danger. In essence, the complaint is that the district court should have refrained from giving a particularized instruction of a motorist's duty of care that was more detailed than the general instruction on ordinary and reasonable care. Interestingly, one of plaintiff's tendered instructions, refused by the court, was a particularized instruction on the duty of a motorist to maintain a proper lookout.
 
 
 92
 Defendants respond that Instruction 45 merely incorporated the proscriptions embodied in two Indiana statutes, Ind. Code Secs. 9-4-1-57(a), (b), 9-4-1-106. In his instructions to the jury, the trial judge read both of these statutes in their entirety.
 
 
 93
 We agree with defendants that Instruction 45 does no more than reiterate the motorist's duty under the two Indiana statutes. In particular, Ind. Code Sec. 9-4-1-57(c) states: "The driver of every vehicle shall ... drive at an appropriate reduced speed when approaching and crossing [a] ... railway grade crossing ...." This provision can serve no purpose other than requiring a driver to be able to stop at a crossing once he perceives or should perceive an approaching train, which is exactly what Instruction 45 requires. The cases cited by plaintiff, such as Virgin v. Lake Erie & Western Railroad, 55 Ind.App. 216, 101 N.E. 500 (1913), and Schlarb v. Henderson, 211 Ind. 1, 4 N.E.2d 205 (1936), are inapposite as they involve mandatory instructions. Plaintiff nowhere maintains that Instruction 45 is a mandatory instruction.
 
 
 94
 We hesitate to reverse a jury verdict based solely upon the redundancy of these instructions. When we review instructions, we
 
 
 95
 look to the instructions as a whole, in a common sense manner, avoiding fastidiousness, inquiring whether the correct message was conveyed to the jury reasonably well. Even if we should discern error in one or more instructions, we will not reverse a jury ... unless we are persuaded the jury's understanding was seriously affected, to the prejudice of the plaintiffs.
 
 
 96
 Wilk v. American Medical Association, 719 F.2d 207, 218-19 (7th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 2399, 81 L.Ed.2d 355 (1984). Furthermore, we note another instruction that the trial judge gave: if a rule "be stated more than once or in different ways, no emphasis is intended by me and none must be inferred by you." Thus, the trial court neutralized any harm to plaintiff from the minimally repetitious aspects of the instructions. Perhaps in some instances, the repetition, either twice or more, of the same idea encompassed in an instruction might be harmful. In this case, however, in light of the entire jury charge, we fail to see how Instruction 45 could have seriously affected the jury's understanding of the issues.
 
 VI. CONCLUSION
 
 97
 We have considered all the arguments of the appellant and find them to be without merit. Accordingly, the judgment of the district court is
 
 
 98
 AFFIRMED.
 
 
 99
 POSNER, Circuit Judge, dissenting.
 
 
 100
 There was one very serious error at trial--the exclusion of the evidence of prior accidents at the grade crossing--and one lesser error--the giving of instruction 45; and together these errors are sufficiently prejudicial to require that the judgment for the defendants be reversed and the plaintiff be given a new trial. I agree however that the other claims of error should be rejected.
 
 
 101
 If because of such things as the angle of the tracks to the road, obstructions to the vision of people using the crossing, the amount of crossing traffic, and the frequency and speed of the trains at the crossing point, a grade crossing is extremely hazardous when the only protective device is a sign (the familiar "cross buck" sign), then the railroad, to avoid being held negligent, may have to go further and put up an electrical signal or a crossing gate, or run the tracks over or under the highway. Stevens v. Norfolk & Western Ry., 171 Ind.App. 334, 339-40, 357 N.E.2d 1, 4 (1976); Indianapolis Union Ry. v. Walker, 162 Ind.App. 166, 172, 318 N.E.2d 578, 582-83 (1974). There was much evidence that the crossing at which Kelsay was killed was indeed extremely hazardous with just a warning sign:
 
 
 102
 1. The tracks cross the road at an angle such that a northbound driver (such as Kelsay) would have to turn his head more than 90 degrees to see a westbound train (such as the one that hit Kelsay).
 
 
 103
 2. In early morning on a clear day, the driver who turns to look for a westbound train will be looking into the sun. Kelsay was killed in early morning on a clear day.
 
 
 104
 3. On the day of the accident the driver's vision along the tracks was obstructed by foliage.
 
 
 105
 4. The road rises to the crossing, and at a fairly steep grade (perhaps 10 degrees).
 
 
 106
 5. Many trains pass by each day--23 on average.
 
 
 107
 6. And judging from the speed of the train that hit Kelsay (58 m.p.h.), they do so at high speeds.
 
 
 108
 Given these conditions, a reasonable jury could have concluded that the railroad's failure to have a flashing-lights signal or some alternative precaution more efficacious than a cross-buck sign was negligent. I therefore cannot see the justification for excluding evidence of two earlier fatal accidents at the crossing. Those accidents had also occurred early in the morning on clear days with the driver going north and the train west. True, one occurred 30 years before the accident to Kelsay and the other 13 years before. But three fatal accidents in 30 years at one crossing averages out to one fatal accident every 10 years, and though the railroad tries to argue that this isn't very many, really it's an enormous number. We were told at argument that there are 13,000 railroad crossings in Indiana, and if they are all as dangerous as the one at which Kelsay was killed this would imply 1,300 fatalities to motorists at railroad crossings in Indiana every year. That is a tremendous number when one considers that in 1983, according to the Federal Railroad Administration, there were only 542 deaths at railroad crossings in the whole United States--less than half as many as we could expect in Indiana alone if the railroad crossing in this case was no more dangerous than the average railroad crossing.
 
 
 109
 It is true that the earlier deaths at this crossing did not occur under identical conditions to Kelsay's, though one of the alleged differences cuts against the railroad's defense. If, as the majority opinion speculates (contrary to the record, though), the traveler's vision at the crossing was not obstructed by foliage when those earlier accidents occurred, this would impose an even greater duty on the railroad thereafter to keep the crossing free from obstructions to vision; the crossing was hazardous even without them. But in any event, the differences among the accidents were matters to be pointed out by the railroad to the jury. They did not go to admissibility. And exclusion was not necessary to avoid a trial within a trial. The issue regarding the earlier accidents would not have been whose fault they were but what they could tell the jury about the dangerousness of the crossing and the railroad's duty to take some steps to protect travelers at it. They could tell the jury plenty. The danger of a crossing is a positive function of the probability that an accident will occur, and one basis for estimating that probability is the frequency of accidents in the past. If for example there has been an average of one accident per year among 10,000 drivers who use a particular crossing, then one can predict, though not with complete confidence, that the probability of an accident at that crossing is .0001 a year; and that probability can be used, in conjunction with the average cost to the victims of these accidents, to decide how many and how expensive (on an annual basis) precautions the railroad should take in the exercise of due care. The history of fatal accidents at the crossing in this case is not sufficient to generate such a nice estimate but is better than nothing; and with all its imperfections (railroad traffic may have declined over the years; there may have been no accidents for fifty years before 1951, in which event the average would be much lower than one every 10 years; etc.), it should have been put before the jury. It was highly relevant; it could have made the difference.
 
 
 110
 Jury instruction 45 reads: "The law requires a driver of a motor vehicle approaching a railroad crossing whose view is obstructed, to drive at such a speed that the vehicle could be stopped, by the exercise of ordinary care, once the driver sees or hears an approaching train which is so close as to constitute an imminent danger." This instruction violates a fundamental principle of tort law, which is that a potential victim's duty of care is to take reasonable precautions against dangers not due to anyone's negligence, but not against the dangers created by potential injurers who are negligent. See, e.g., Smith v. Insurance Co. of North America, 411 N.E.2d 638, 641 (Ind.App.1980); Phillips v. Croy, 173 Ind.App. 401, 405, 363 N.E.2d 1283, 1285 (1977); Hi-Speed Auto Wash, Inc. v. Simeri, 169 Ind.App. 116, 123, 346 N.E.2d 607, 610 (1976). Instruction 45 means that the traveler at this crossing, if he is to avoid being held contributorily negligent (a complete defense in Indiana to a negligence suit), must approach the crossing with such extreme caution that even if a train is coming at 100 m.p.h. he will be able to stop. This is not the law in Indiana or anywhere else. If it were, it would encourage railroads and other potential injurers to behave as carelessly as possible, in order to induce potential victims to take whatever care was necessary to avoid injury. Instead of both potential injurers and potential victims being required to take reasonable precautions, potential injurers would be required to take no precautions and potential victims would be required to take all precautions.
 
 
 111
 Of course, like all legal principles, the principle that you do not have to act with the caution that would be appropriate if you assumed that others were negligent must not be pushed too far. You may not, if your vision is obstructed at a railroad crossing (as Kelsay's was), drive at the same speed and with the same care as if it were clear. The danger is too palpable to be ignored. See Phillips v. Croy, supra, 173 Ind.App. at 405, 363 N.E.2d at 1285, and Southern Indiana Gas & Elec. Co. v. Scoles, 435 N.E.2d 287, 292-93 (Ind.App.1982), for the general principle. But neither are you required to imagine and guard against all the ways in which a railroad could endanger you by its negligence; and that is what instruction 45 requires.
 
 
 112
 One instruction, considered in isolation, is not likely to swing a verdict, at least where as here the error is a subtle one that a juror blessed with common sense would probably disregard even if he noticed what the instruction literally implies. But the error reinforces the far more prejudicial error of withholding highly probative evidence from the jury, and the two errors together entitle the plaintiff to a new trial.
 
 
 
 [1]
 This statement attributed to the court by the reporter, according to the plaintiff in her reply brief was a transcription error and the statement was actually made by the witness. We have no reason to doubt that the plaintiff's representation is correct; this is obvious from the context. We will treat this as having been the statement of the witness. If it had been the court making the statement, this in itself would indicate the court's opinion that the law did not require a driver to stop at the white line